## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HANNAH ROMAINE
CLECKNER,                          )
an individual,                     )
                                   )
        *Plaintiff,*               )
                                   )        Case No. _____
        v.                         )
                                   )
3M COMPANY,                        )        **COMPLAINT**
                                   )
        *Defendant.*               )        **[JURY TRIAL DEMANDED]**
_____    )

1.      Plaintiff Hannah Romaine Cleckner seeks relief from Defendant 3M Company's pattern of discriminatory and illegal behavior against employees who hold sincere religious and medical objections to 3M's COVID-19 vaccination mandate policy.

2.      In October 2021, Defendant imposed an unnecessary, draconian vaccine mandate for all employees that addresses a very remote risk: asymptomatic deadly spread of COVID-19 to fellow employees, by a method (vaccination) that poses a higher risk of deadly spread of COVID-19 than asymptomatic spread.

3.      Defendant refused to accept and accommodate Plaintiff's sincere objections to the vaccine.

4.      Defendant's unlawful actions left Plaintiff with the impossible choice of suffering a physical assault and uninvited invasion of her body by receiving the experimental and harmful mRNA COVID-19 vaccine, at the expense of her religious beliefs, bodily autonomy, medical privacy, and possibly health, or losing her livelihood.

5.      This Faustian bargain is no bargain at all and is precisely what is forbidden by federal and Pennsylvania civil rights law.

6.      Defendant's actions violated federal and Pennsylvania law by mandating an experimental medical treatment, failing to provide reasonable accommodations for exemptions, and violating the sacred rights of privacy and bodily integrity.

7.      Plaintiff respectfully implores this Court to order that Defendant comply with the laws protecting the rights of the citizens of Pennsylvania against precisely such Catch-22 "choices."

## **PARTIES**

8.      Plaintiff Hannah Romaine Cleckner ("Cleckner" or "Plaintiff") is a resident of Palmyra, Pennsylvania. She was employed at 3M Company as a Patient Support Specialist (PSS) who sold 3M's negative pressure wound therapy units to patients at seven hospitals in the vicinity of Palmyra. Part of Plaintiff's job was helping transition patients home with a wound vac upon discharge.

9.      She was subjected to discriminatory treatment and terminated because of 3M's COVID-19 vaccine mandate.

10.     3M Company ("3M" or "Defendant") is a technology company that manufactures health, safety, industrial and consumer products. As of 2021, 3M employed nearly 100,000 employees worldwide. 3M is headquartered in Saint Paul, Minnesota.

## **JURISDICTION AND VENUE**

11.     This Court has original jurisdiction over the subject matter of this dispute pursuant to 28 United States Code ("U.S.C.") Section 1331. Plaintiff seeks remedies

under Title VII of the Civil Rights Act pursuant to 42 U.S.C. § 2000e et seq. and Title III

of the Americans with Disabilities Act under 42 U.S.C. §§ 12181, et seq.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b), because a substantial

part of the events and omissions giving rise to Plaintiff's claims occurred in this judicial

district.

13.     An actual and justiciable controversy exists between Plaintiff and Defendant.

## FACTS AND BACKGROUND

**3M's Discriminatory Treatment of Plaintiff**

14.     In September 2021, 3M mandated that Plaintiff become fully vaccinated for

COVID-19 by December 8, 2021. All salaried employees were subject to the same

requirement.

15.     Plaintiff was told that she would be terminated if she did not become fully

vaccinated.

16.     3M provided an online questionnaire that allowed employees to request religious

and medical accommodations and exemptions from the mandate. A third party,

Sedgwick, was assisting 3M with the exemption process.

17.     Plaintiff submitted her religious accommodation request on Oct. 26, 2021. *See*

Exhibit A.

18.     Plaintiff belongs to the Lives Changed By Christ church in Manheim,

Pennsylvania.

19.     In her request, Plaintiff quoted scripture and explained that she trusted in God and

in the way that He made her and her immune system, which has never failed her.

20.     Plaintiff overcame a COVID-19 infection at the end of December 2020 and

therefore, likely has natural immunity.

21.     Right before Thanksgiving, 2021, 3M denied Plaintiff's religious accommodation

request. 3M stated: "We have concluded that you have not demonstrated that you have a

sincerely held religious belief that prevents you from receiving a COVID-19 vaccine

and/or there is no reasonable accommodation that the Company can provide you that will

not place an undue hardship on the Company." *See* Exhibit B.

22.     3M informed Plaintiff that they had no details regarding her individual request

and that there was no process to appeal 3M's exemption decisions.

23.     3M failed to provide any detailed reasons for denying Plaintiff's exemption

request.

24.     Plaintiff had been employed at the job since February 2018.

25.     Plaintiff had been executing a hybrid work-from-home schedule when the vaccine

mandate was implemented.

26.     When COVID-19 first hit, the hospitals locked out vendors such as Plaintiff.

27.     During this time, Plaintiff would do her "rounding," or meeting with patients,

remotely via such methods as phone calls, email, text and Zoom videoconferences.

28.     Plaintiff could complete all of her job's tasks remotely.

29.     Plaintiff could successfully fulfill all her job duties remotely. However, after her

exemption was denied, Plaintiff applied for two internal remote 3M positions, but had no

success with that request.

30.     Plaintiff also applied for a non-remote Wound Healing Manager position, but was

denied because she was unvaccinated.

31.     In early January of 2020, 3M abandoned its mandate once the Federal mandate was overturned.

32.     Plaintiff believed her job was safe.

33.     However, in April of 2022, the Centers for Medicare & Medicaid Services (CMS) required that hospital staff in a number of states be required to get the COVID-19 vaccination. That was the result of CMS's Revised Guidance for the Interim Final Rule-Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination.

34.     Consequently, 3M reinstated the COVID-19 vaccination mandate for Plaintiff and other 3M employees. All 3M employees who did not receive the COVID-19 vaccine or did not have an approved medical or religious exemption would be under review in May of 2022. *See* Exhibit C.

35.     Plaintiff resubmitted her request for an exemption to the vaccine mandate and explicitly added a paragraph detailing her religious objections due the vaccines' use of fetal cells. *See* Exhibit D.

36.     Plaintiff knows of other 3M employees who were given exemptions by 3M to the COVID-19 vaccination because of religious beliefs similar to hers.

37.     A number of hospitals at which Plaintiff sold 3M units approved Plaintiff's religious exemption letter, after Plaintiff sent it to them. WellSpan and UPMC Pinnacle approved Plaintiff's religious exemption and Plaintiff sent the approval to Kathy Lanciano at 3M, who sent that approval up the chain.

38.     On May 3, 2022, 3M again denied Plaintiff's second religious exemption request. *See* Exhibit E.

39.     Plaintiff had a call with Carol Clindinst and Cheryl Lundin, after Kathy Lanciano made them aware of WellSpan's approval. During this conversation, Ms. Clindinst told Plaintiff she would look into reversing the decision on her exemption denial.

40.     Human Resources scheduled two mandatory meetings with Plaintiff to discuss a reversal further; both meetings were cancelled.

41.     On May 23, 2022, Ms. Clindinst informed Plaintiff that her exemption denial could not be reversed.

42.     Plaintiff was officially terminated on May 25, 2022 for not complying with 3M's vaccine mandate.

43.     Plaintiff was an exemplary and valuable 3M employee.

44.     Her base pay was approximately $71,000, annually, with a commission of $30,000 if she met her sales quotas, bringing her annual salary to roughly $101,000.

45.     Being fired caused significant damage to Plaintiff.

46.     Plaintiff filed two separate complaints with the U.S. Equal Employment Opportunity Commission ("EEOC"). One on November 4, 2021 and another on April 20, 2022. Plaintiff had an interview with an EEOC investigator on July 21, 2022.

47.     Plaintiff received a Notice of Right to Sue from the EEOC on September 28, 2022. *See* Exhibit F. This Complaint has followed.

**COVID Vaccines Violate Plaintiff's Religious Beliefs**

48.     Plaintiff holds sincere religious concerns surrounding the process used to manufacture the vaccines.

49.     Presently, all COVID-19 vaccines have made use either in production or testing of fetal cell lines developed from tissues derived from aborted fetuses (see excerpt

below).[1]



In various stages of vaccine development and manufacturing, some of the COVID-19 vaccines used cells originally isolated from fetal tissue (often referred to as fetal cells), some of which were originally derived from an aborted fetus. The use of fetal cell lines is a very sensitive and important topic within some faith communities and among individuals with concerns about the ethics of using materials derived in this way.

50.     For example, the Johnson & Johnson vaccines used fetal cell cultures, specifically PER.C6, a retinal cell line that was isolated from a terminated fetus in 1985.[2]

51.     In an interview with WREG-TV, Dr. Steve Threlkeld, president of the medical staff at Baptist Hospital in Memphis, Tennessee, acknowledged fetal cell lines used to produce or test the Johnson & Johnson COVID-19 vaccines "were actually recovered from an aborted fetus in the 70s or 80s and there are several of these cell lines."[3]

52.     The Louisiana Department of Health likewise confirms that the Johnson & Johnson COVID-19 vaccine used the PER.C6 fetal cell line, which "is a retinal cell line that was isolated from a terminated fetus in 1985."[4]

---

[1] *See,* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines*, http://publichealth.lacounty.gov/media/Coronavirus/docs/vaccine/VaccineDevelopment_FetalCellLines.pdf (last accessed August 26, 2021)

[2] Are the vaccines made with fetal cells, Institute for Clinical Systems Improvement, https://www.icsi.org/covid-19-vaccine-faq/are-the-mrna-vaccines-made-with-fetal-cells/ (last accessed August 26, 2021), see also, Tennessee Department of Health, Fact v. Fiction: Johnson & Johnson Vaccine(2021) available at https://covid19.tn.gov/stay-informed/blogs/fact-v-fiction-johnson-johnson-vaccine/ (last visited Sept. 27, 2021) (acknowledging the Johnson & Johnson vaccine was developed from a fetal cell line).

[3] WREG, *State: Fetal cell lines, not fetal tissue, were used to make Johnson & Johnson vaccine* (March 5, 2021) available at https://www.wreg.com/news/state-fetal-cell-lines-not-fetal-tissue-was-used-to-make-johnson-johnson-vaccine/ (last visited Sept. 27, 2021).

[4] La. Dept of Public Health, *You Have Questions, We Have Answers: COVID-19 Vaccine FAQ* (Dec. 21, 2020), https://ldh.la.gov/assets/oph/Center-PHCH/Center-PH/immunizations/You_Have_Qs_COVID-19_Vaccine_FAQ.pdf (emphasis added) (last visited Oct. 24, 2022).

53.        As for the EUA-Pfizer and Moderna COVID-19 vaccines, fetal cell line HEK 293

was used during the research and development phase.[5] All HEK 293 cells are descended

from tissue taken in 1973 from either an elective abortion or miscarriage[6] that took place

in the Netherlands.[7]

54.        While the production of the vaccines did not reportedly require any new

abortions, Plaintiff objects to receiving the COVID-19 vaccines on the basis that, even

assuming the vaccines do confer a meaningful health benefit, that benefit is one from ill-

gotten gains.

55.        Plaintiff believes any benefit the COVID-19 vaccines may confer flows from the

unjust exploitation of unborn human life. On this basis alone, Plaintiff refused on

religious grounds to accept or be forced to accept the COVID-19 vaccines.

**Defendant Cannot Show that Allowing Unvaccinated Employees to Stay Would Cause an Undue Hardship**

56.        Defendant denied Plaintiff's religious exemption on the grounds that granting it

would impose an undue hardship on Defendant.

57.        The only grounds for claiming undue hardship would be the claim that

unvaccinated employees would pose a risk to their coworkers.

58.        Where (1) the COVID-19 vaccine is not effective at reducing infection; (2) the

COVID-19 vaccine is not effective at preventing transmission, (3) natural immunity to

SARS-CoV-2 is preferential to vaccine-induced immunity, and (4) the vaccine poses

---

[5] *See*, Nebraska Medicine, *You asked, we answered: Do the COVID-19 vaccines contain aborted fetal cells?*, https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells, (last visited on Aug. 26, 2021).

[6] *COVID-19 Vaccine and Fetal Cell Lines.*

[7] *Ibid.*

abundant health risk, Plaintiff not only poses no risk to fellow 3M employees but are themselves put at risk from Defendant's mandate.

### The COVID-19 Vaccine Does Not Prevent Infection or Transmission

59.     The COVID-19 vaccine has been ineffective at preventing the transmission and infection of SARS-CoV-2.

60.     A study published in the European Journal of Epidemiology analyzing data from 68 countries and 2,947 counties in the United States found "no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases."[8] Nor was there a significant indication of "COVID-19 case decreases with higher percentages of population fully vaccinated." Rather, they found a "marginally positive association such that countries with higher percentages of population fully vaccinated have higher COVID-19 cases per 1 million people."[9]

61.     Indeed, the vaccine has demonstrated *negative effectiveness* and could even increase the risk of infection.[10]

---

[8] S.V. Subramanian, et al., *Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States,* European Journal of Epidemiology (September 9, 2021), available at http://doi.org/10.1007/s10654-021-00808-7.
[9] *Ibid.*
[10] Altarawneh, H., Chemaitelli, H., et al. *Effects of Previous Infection and Vaccination on Symptomatic Omicron Infections,* N. Engl. J. Med. 2022; July 7, 2022, DOI: 10.1056/NEJMoa2203965; Florentino, P., Millington, T., *Vaccine effectiveness of two-dose BNT162b2 against symptomatic and severe COVID-19 among adolescents in Brazil and Scotland over time: a test-negative case-control study,* The Lancet, August 8, 2022, DOI: https://doi.org/10.1016/S1473-3099(22)00451-0; *see* Nass, Meryl, COVID-19 Vaccines Don't Prevent Transmission, Severe Illness or Deaths, Data Show, *The Defender,* April 4, 2022, available at https://childrenshealthdefense.org/defender/covid-vaccines-dont-prevent-transmission-severe-illness-deaths-data/.

62.      Israeli data found that those who had received the BioNTech vaccine were 6.72 times more likely to suffer a subsequent infection than those with natural immunity.[11] Israeli data also indicates the protection BioNTech grants against infection is short-lived compared to natural immunity and degrades significantly faster.

63.      A paper published in *Eurosurveillance*, a journal published by the European Centers for Disease Control, documents a significant outbreak of COVID-19 among fully vaccinated patients and staff at a hospital in Tel Aviv.[12] At the time of the outbreak, investigators determined 238 out of 248 of exposed patients and staff had been fully vaccinated with Pfizer's mRNA vaccine. Ultimately, 39 out of the 238 exposed vaccinated people (16 percent) were infected, along with 3 out of 10 unvaccinated people - a difference that doesn't reach statistical significance because the unvaccinated group is too small. Of the infected, 23 were patients and 19 staff.[13] The staff all recovered quickly, but five patients died and another nine had severe or critical cases. ***All were vaccinated***. On the other hand, the two unvaccinated infected patients both had only ***mild*** cases of COVID-19.

---

[11] David Rosenberg, *Natural Infection vs Vaccination: Which Gives More Protection?* Israel National News, (Jul. 13, 2021), available at https://www.israelnationalnews.com/ News/News.aspx/309762 (last visited Aug. 26, 2021).
[12] Pinina Shitrit, et. al., *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021*, (July 2021) available at https://www.eurosurveillance.org/content/10.2807/1560-7917.ES.2021.26.39.2100822#html_fulltext (last visited on Oct. 3, 2021).
[13] *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021.*

64.     A senior Pfizer executive recently admitted that Pfizer did not even know whether its mRNA COVID-19 shot stopped transmission before Pfizer began administering it to the public.[14]

65.     It should, therefore, come as no surprise that in their real-world application the vaccines have not shown that they are effective at stopping infection or preventing vaccinated persons from spreading the virus.

### Natural Immunity is Durable, Lasting, and Superior to Vaccination

66.     Natural immunity is robust, durable, and complete against all variations of SARS-CoV-2.

67.     There is strong evidence that persons who have been infected with SARS-CoV-2 and recovered are protected from future reinfection for over a year, and potentially have lifelong immunity – unlike vaccinated persons for whom boosters are already being recommended and administered.[15] However, Defendant wholesale disregards the relevance of natural immunity entirely.

68.     A bevy of epidemiological studies demonstrate to a reasonable degree of medical certainty that natural immunity following infection and recovery from the SARS-CoV-2

---

[14] Pfizer did not know whether Covid vaccine stopped transmission before rollout, executive admits, October 13, 2022, *news.com.au*, available at https://www.news.com.au/technology/science/human-body/pfizer-did-not-know-whether-covid-vaccine-stopped-transmission-before-rollout-executive-admits/news-story/f307f28f794e173ac017a62784fec414

[15] *See*, Yair Goldberg; Micha Mandel, et al., *Protection of previous SARS-CoV-2 infection is similar to that of BNT162b2 vaccine protection: A three month nationwide experience from Israel*, medRxiv (April 20, 2021) available at https://www.medrxiv.org/content/10.1101/2021.04.20.21255670v1 (last visited on Aug. 26, 2021); *See*, also Jackson S. Turner; Wooseob Kim, et al., *SARS-CoV-2 infection induces long-lived bone marrow plasma cells in humans*, Nature 595 (pp. 421-425) (May 24, 2021).

virus provides robust and durable protection against reinfection, at levels equal to or better than the most effective vaccines currently available.[16]

69.     Israeli researchers conducting a massive group study found exceedingly low reinfection rates for people previously infected with COVID-19.[17] More interestingly, the Israeli scientists found people who receive both doses of the EUA-approved Pfizer shot were up to *13 times more likely to contract the virus than those who were previously infected with the virus* and that "natural immunity confers longer lasting and stronger protection against infection."[18]

70.     Consistent with the Israeli research team's findings, the Cleveland Clinic found similar data supporting the strong durability of natural immunity. In June of 2021, the Cleveland Clinic released a study of 1,359 previously infected health care workers. Researchers found a reinfection rate of *zero*, despite some of the studied individuals having been around COVID-positive patients more than the regular population.[19] Not one of the 1,359 previously infected subjects who remained unvaccinated, had a SARS-CoV-2 infection over the duration of the Cleveland Clinic study.[20]

---

[16] *See, e.g.* N. Kojima; A. Roshani, et al., *Incidence of Severe Acute Respiratory Syndrome Coronavirus-2 Infection among previously infected or vaccinated employees*, medRxiv (July 3, 2021) available at https://www.medrxiv.org/content/10.1101/2021.07.03.21259976v2 (last visited on Aug. 26, 2021).

[17] *See*, Svian Gazit, et. al., *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections*, medRxiv, https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf (last visited on Aug. 26, 2021).

[18] *Ibid.*

[19] Nabin K. Shrestha, et. al., *Necessity of COVID-19 vaccination in previously infected individuals*, medRxiv, (June 5, 2021) available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2, (last visited on August 26, 2021).

[20] *Ibid.*

71.    The Cleveland Clinic researchers concluded: "***Individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID-19 vaccination***, and vaccines can be safely prioritized to those who have not been infected before." (emphasis added).[21]

72.    Given the mounting body of compelling research, it is medically unnecessary for persons who have recovered from COVID-19 and present evidence of natural immunity, to undergo vaccination for SARS-CoV-2. Indeed, it is beneficial for most individuals to be naturally introduced to the virus.

73.    Defendant knew or should have known of this early research at the time it implemented its vaccine mandate.

74.    Forcing Plaintiffs, who may have had natural immunity, to receive the COVID-19 vaccines would not only offer them or those around them little benefit, but it would also subject them to an elevated risk of adverse side effects, including death, as demonstrated below.

***Vaccination Poses Substantial Health Risks***

75.    All three of the available COVID-19 vaccines available in the United States are marketable under Emergency Use Authorization ("EUA") and based entirely on a limited set of clinical trials executed over a matter of mere months before vaccines were administered to the public. Recent information has revealed that these trials were riddled with massive fraud, falsified data, and negligent and intentional error.

---

[21] Nabin K. Shrestha, et. al., *Necessity of COVID-19 vaccination in previously infected individuals*, medRxiv, (June 5, 2021) available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2, (last visited on August 26, 2021).

76.     Though the FDA has approved the use of Comirnaty for future use, Pfizer has admitted that Comirnaty is not currently available to the public.

77.     There has never been a successful coronavirus vaccine in history.

78.     Governmental authorities revised their definition of the word "vaccine" itself in order to continue to label these experimental drugs with novel ingredients because they fail to meet the test of traditionally defined vaccines, which actually inoculated against infection and prevented transmission, neither of which COVID-19 vaccines can any longer claim credit for.

79.     Recent reporting data presents an alarming picture: as of the time of this filing, there have been 31,446 deaths reported to VAERS from COVID-19 vaccines and 1,591,545 total adverse events.[22]

80.     The input of event reports to VAERS since the COVID vaccines were rolled out is ***far greater than all cumulative adverse event reports to VAERS for the prior 30 years***: an alarming statistic.

81.     This data is likely staggeringly underestimated, as past attempts to investigate VAERS reporting rate have suggested that between 1 percent and 13 percent of actual adverse effects get reported; however, because CDC changed VAERS reporting recently

---

[22]

https://wonder.cdc.gov/controller/datarequest/D8;jsessionid=0E84A6725F6EA0434A7910838E0C; Josh Guetzhow, Safety Signals for COVID Vaccines Are Loud and Clear. Why Is Nobody Listening?, THE DEFENDER, (Sept. 29, 2021) available at https://childrenshealthdefense.org/defender/safety-signals-covid-vaccines-full-transparency-cdc-fda/ (last visited Oct. 2, 2021).

to include additional data, it is not possible to estimate the degree of underreporting based on past attempts to do so.[23] The CDC has failed to account for this underreporting.

82.    Recent estimates suggest that the rate of injury for vaccinated individuals is 5.1 percent.[24]

83.    COVID-19 vaccines have been known to cause a myriad of adverse effects: myocarditis, pericarditis, Guillain-Barre syndrome, antibody-dependent enhancement, fertility concerns, menstrual health issues, and many other conditions.

84.    Especially alarmingly high rates of myocarditis and pericarditis following vaccination have been witnessed in all age groups, but particularly in young males.[25] Stories of young athletes collapsing on the field due to heart problems have plagued the media. Because of underreporting, the risk of myocarditis following SARS-CoV-2 vaccination may be more serious than reported.

85.    Furthermore, spike proteins, the putative antigen induced by Pfizer-BioNTech COVID vaccine, are a toxin. They are produced and enter the circulatory system, have predictable negative consequences to vascular endothelium, activate platelets, and cross

---

[23] Varricchio F, Iskander J, Destefano F, Ball R, Pless R, Braun MM, Chen RT. Understanding vaccine safety information from the Vaccine Adverse Event Reporting System. Pediatr Infect Dis J. 2004 Apr;23(4):287-94. doi: 10.1097/00006454-200404000-00002. PMID: 15071280.
[24] *Horowitz: German insurance claims hint at millions of unreported COVID vaccine injuries*, August 15, 2022, available at https://www.conservativereview.com/horowitz-german-insurance-claims-vaccine-injury-2657863726.html.
[25] Krug A, Stevenson J, Høeg TB. BNT162b2 Vaccine-Associated Myo/Pericarditis in Adolescents: A Stratified Risk-Benefit Analysis. Eur J Clin Invest. 2022 May;52(5):e13759. doi: 10.1111/eci.13759. Epub 2022 Mar 4. PMID: 35156705; PMCID: PMC9111575; Gill J, Tashjian R, Autopsy Histopathologic Cardiac Findings in 2 Adolescents Following the Second COVID-19 Vaccine Dose. Arch Pathol Lab Med (2022); 146(8): 925-929. Doi: https://doi.org/10.5858/arpa.2021-0435-SA; Watanabe S, Hama R, SARS-CoV-2 vaccine and increased myocarditis mortality risk: a population based comparative study in Japan. Oct 18 2022, doi: https://doi.org/10.1101/2022.10.13.22281036.

the blood brain barrier.  It would be expected to trigger the destruction of cells that produce it and present it on their surfaces.

86.    We now know that vaccine-induced spike proteins circulate throughout the body and accumulate in large concentrations in organs and tissues, including the spleen, bone marrow, liver, adrenal glands, and especially the ovaries.[26] Strong but not yet conclusive evidence links spike protein *in vivo* to blood clots, thrombocytopenia, hemorrhages, heart attacks and strokes.

87.    The potential adverse effects Plaintiff faces in being coerced to receive the COVID-19 vaccines pursuant to Defendant's mandate are not theoretical, hypothetical or academic—they are very real and have real victims.

88.    The empirical evidence and recent studies have provided definitive proof that these vaccines cannot boast safety and effectiveness. In no such circumstances should these experimental medical products be mandated in any setting.

89.    Given these proven facts, which were accessible at the time that 3M implemented its vaccine mandate, Defendant knew or should have known that allowing Plaintiff to continue at her positions would not pose a risk or undue burden to 3M.

**Employers Who Have Failed to Provide Reasonable Accommodations for Vaccine Mandates Have Been Held Liable**

90.    The discouragement or denial of religious accommodations from employers' mandatory vaccine policies has been found unlawful, even when those mandates were proscribed by hospitals. Indeed, numerous employers have been sued and lost over forced

---

[26] Megan Redshaw, *'We Made a Big Mistake' – COVID Vaccine Spike Protein Travels From Injection Site, Can Cause Organ Damage,* The Defender (June 3, 2021), https://childrenshealthdefense.org/defender/covid-vaccine-spike-protein-travels-from-injection-site-organ-damage/.

vaccines. *See, e.g. EEOC v. Mission Hosp. Inc.*, No. 1:16-cv-118-MOC-DL, 2017 WL

3392783 (W.D.N.C. Aug. 2017) [resulting in permanent injunction against the employer

from improperly denying religious exemptions from mandated vaccines and requiring

employer to pay $89,000 in damages]; *United States v. Ozaukee County*, No 18-cv-343-

pp (E.D. Wis. 2018) [resulting in a permanent injunction against the employer for failure

to grant religious exemptions from compulsory vaccines and order payment of damages

to employee].

91.     Likewise, in *EEOC v. Saint Vincent Health Center*, Civil Action No. 1:16-cv-234

(2016), the employer agreed to pay $300,000 to a class of six aggrieved former

employees and provided substantial injunctive relief to settle a religious discrimination

lawsuit based upon a failure to grant a religious exemption as part of a mandatory

seasonal flu vaccination requirement for its employees.

92.     Moreover, in *EEOC v. Memorial Healthcare*, Civil Action No. 2:18-cv-10523

(2018), the defendant employer paid $74,418 ($34,418 in back pay, $20,000 in

compensatory damages and $20,000 in punitive damages) for refusing to hire a medical

transcriptionist because of her religious beliefs against receiving flu shots and refusing to

accommodate those beliefs.

93.     In fact, as recently as 2018, the U.S. Equal Employment Opportunity Commission

sued Nashville-based Saint Thomas Health, after the employer failed to make a

reasonable religious accommodation for the flu vaccine. *EEOC v. Saint Thomas Health*,

Civil Action No. 3:18-cv-00978 (M.D. Tenn. 2018).

94.     The *Saint Thomas Health* case resulted in a consent decree enjoining the

employer from failing to provide religious accommodations to an employee's sincerely

held religious beliefs unless such requests created an undue hardship. The decree also awarded the injured employee $75,000 in damages and directed the employer to issue the employee an apology letter.

95.     Indeed, on November 12, 2021, the U.S. Court of Appeals for the Fifth Circuit granted a stay of the Occupational Safety and Health Administration's nationwide vaccine mandate, stating that the mandate "raises serious constitutional concerns" and that "a denial of the petitioners' proposed stay would do them irreparable harm," as the Mandate threatens to substantially burden the liberty interest of reluctant individual recipients put to a choice between their job(s) and their jab(s)." BST Holdings v. OSHA, Order Granting Stay (U.S. Ct. App. 5th Cir.) (November 12, 2021). In implementing the mandate, the 5th Circuit concluded that OSHA likely "violates the constitutional structure that safeguards our collective liberty." *Ibid.*

96.     What is more, on November 21, 2021, the Honorable District Judge William LaFortune of the Tulsa County District Court granted the State of Oklahoma's application for a temporary restraining order against Ascension Healthcare, after the hospital rode roughshod over the religious rights of its employees by imposing a draconian vaccine mandate similar to 3M's. *O'Connor v. Ascension Healthcare*, Case. No. CJ-2021-3251 (Tulsa Cnty. Dist. Ct. 2021) (docket publicly accessible on OSCN.net); *See also O'Connor v. Ascension Healthcare*, Case No. 21-CV-488-TCK-SH (N.D. Okla. 2021) (the Honorable Judge Kern remanding the case to Tulsa County District Court for further proceedings).

**3M's Mandate Continues the Inglorious History of Medical Experiments**

97.	Born amidst malaria and smallpox pandemics, the Constitution authorized no emergency exception to the liberties secured under it.

98.	The Founding Fathers understood the virus of concentrated power posed more of a threat than any biological virus could.

99.	The Ninth Amendment to the Constitution safeguarded all ancient rights and liberties, including the ancient tort of battery. United States Constitution, Amendment IX.

100.	The right against battery assured "the right of every individual to the possession and control of her own person, free from all restraint or interference of others," which would be "sacred" and protected under the law. *Union Pacific R. Co. Botsford*, 141 U.S. 250, 251 (1891).

101.	The famed Justice Benjamin Cardozo defined the doctrine as the universal right of every person "to determine what shall be done with her own body." *Schloendorff v. Society of New York Hospital*, 105 N.E. 92, 93 (1914).

102.	This right to informed consent incorporates necessarily the right to refuse treatment: "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Washington v. Harper*, 494 U.S. 210, 229 (1990).

103.	The Nuremberg Code enshrines the right of informed consent as a matter of universal law, so widely recognized, courts consider it a jus cogens legal principle enforceable everywhere. *Abdullah v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009).

104.	Based on these precepts, courts require clear and convincing evidence that a person poses an imminent, severe risk to others before those individuals may be subject

to forced medical care. *O'Conner v. Donaldson*, 422 U.S. 563 (1975); *Addington v. Texas*, 441 U.S. 418 (1978).

### Eugenics Era

105.     We only deviated from this Informed Consent standard of medical care during the Eugenics Era, a diseased doctrine birthed in the medical academies of the United States at the turn of the last century, as a deformed outgrowth of the then in-vogue school of Social Darwinism.

106.     A trio of decisions carved out emergency exceptions to Constitutional liberties, including authorizing a fine for not taking a vaccine (*Jacobson v. Massachusetts*, 197 U.S. 11 (1905)), forced sterilizations of poor and politically unprotected populations (*Buck v. Bell,* 274 U.S. 200 (1927), which relied exclusively on expanding Jacobson), and culminated in the kind of "emergency exception" logic that led a court to authorize forced detention camps. *Korematsu v. United States*, 323 U.S. 214 (1944).

107.     This trilogy of infamy sees its corpses rise again as "precedents" seemingly permitting governments to reinstate Eugenics-Era logic across the legal landscape. Indeed, recent governmental defendants cited the forced sterilization decision in Buck as the basis for forced vaccine mandates of teenagers. *Buck v. Bell*, 274 U.S. 200 (1927).

### Nuremberg Code Era

108.     Reeling from the moral horror of the Nazi regime, and its enthusiastic embrace of eugenics, American jurists led the way in reestablishing the Constitutional order by invalidating the eugenics-era precedents and by instituting the Nuremberg Code of 1947, whose governing principles of Informed Consent for all matters of medicine form a jus

cogens principle of universal, internationally recognized law, enforceable amongst all civilized nations, as federal courts established.

109.     The right to bodily autonomy formed the foundation for Supreme Court recognition of the right to privacy and guided the standards governing all matters of medical care concerning the state. Only clear and convincing evidence of an imminent danger to others justifies forced medical care. *Washington v. Harper*, 494 U.S. 210, 229 (1990); *Addington v. Texas*, 441 U.S. 418 (1978).

110.     Only business necessity warrants a place of public accommodation or employer to discriminate against someone based on her perceived medical status. 42 U.S.C. § 12101.

111.     The Nuremberg Code-derived governance of medical authority reversed the eugenics-era precedents, empowered individuals with a meaningful participatory role, and empowered democratic oversight, judicial supervision, and procedural safeguards on the medical regulatory process, enshrining informed consent as the ethical foundation of modern medicine and a fundamental human liberty so universal that courts acknowledge it as a peremptory norm.

***Rushed Drugs & Medical Experiments***

112.     The concern over uninformed, nonconsensual and pharmacological failures haunt the history of rushed drugs, biologics and negligent courts.

113.     From Tuskegee to the military, from the foster homes of young women to the Indian health care services on reservations, from facilities for the mentally ill to jails for women, the least powerful and most trusting have been victimized by government medical experimentation, without recourse or remedy.

114.     Deceptive denial of syphilis treatment, forced sterilizations, testing of radioactive ingredients on unwitting patients, psychological experimentation on unsuspecting students (like the MK-Ultra type testing on Ted Kaczynski at Harvard), the LSD testing on government employees, the chemical testing over San Francisco or in New York City subways, the mustard gas secret tests on drafted soldiers – history has taught us that government must be reined in lest it treat its citizenry as rats in a cage or guinea pigs for experimentation.

115.     In 1955, regulators rushed approval of a polio vaccine that caused an outbreak of polio in hundreds of children, known as the Cutter Incident. Later scholars attributed the blame to the federal government's failures in rushing the product to market. In 1959, the Belgian Congo rushed another polio vaccine.

116.     Twenty-five years later, a new virus emerged in the population: AIDS. Detailed journalistic investigations have attributed it to the use of contaminated monkey kidneys in the development of polio vaccines.  In 1963, Americans discovered that the polio vaccine from monkey kidneys contained the Simian Virus 40 that could cause cancer in humans. In 1976, the Ford administration rushed a vaccine for swine flu.

117.     The virus proved less deadly than anticipated, but the vaccine proved far more dangerous, causing thousands of Americans to develop a serious neurological disorder known as Guillain-Barre Syndrome, causing paralysis.

118.     As the "60 Minutes" report from the time identified, the FDA was again the source of failure because of the rushed, pressured political environment of the time. Most recently, in 2018, the World Health Organization rushed approval of a vaccine against

Dengue Fever, despite warnings from dissident doctors, which left hundreds of children dead and thousands more injured.

119.      Defendant, in implementing its vaccine mandate and coercing employees to take this rushed and potentially dangerous vaccine, is continuing this sordid history.

## FIRST CAUSE OF ACTION
### Religious Discrimination
**[Violation of Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e et seq.]**

120.      Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

121.      Title VII prohibits "discriminat[ion] against any individual with respect to their compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see also EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015).[27]

122.      Title VII imposes upon an employer the duty to make reasonable accommodations for the religious observances short of incurring an undue hardship.

123.      Once an employee has established a prima facie case of discrimination, the burden shifts to the defendant to show that it could not reasonably accommodate the employee without undue hardship. *Maroko v. Werner Enterprises, Inc.*, 778 F. Supp. 2d 993 (D. Minn. 2011).

---

[27] As the Supreme Court has recognized, employees' "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit [legal] protection." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714 (1981); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). Additionally, though membership in or adherence to the tenets of an organized religion is plainly sufficient to provide protection for an individual's sincerely held religious beliefs, it is not a necessary precondition. *See Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 834 (1989)

124.     Plaintiff asserted bona fide religious beliefs that conflicted with 3M's mandatory vaccine policy and notified 3M of those beliefs by filing an exemption and accommodation request per 3M's policies.

125.     Defendant 3M utterly failed to offer any reasonable accommodation, failed to engage in the interactive process with Plaintiff, failed to perform an individualized assessment of Plaintiff's request, and ultimately denied Plaintiff's religious exemption.

126.     Defendant took adverse employment action against Plaintiff by terminating employment.

127.     By denying reasonable accommodation and executing punitive measures against Plaintiff, Defendant discriminated against Plaintiff due to her religious beliefs.

128.     Defendant's failure to provide religious accommodations has substantially injured Plaintiff. For example, Plaintiff lost income for eight weeks until she found another job. Being fired because of her religious beliefs was "earth-shattering" for the Plaintiff. She was emotionally stressed before her termination, because of the uncertainty surrounding her employment.

129.     On these facts, Plaintiff establishes a prima facie case that shows Defendant failed to make any reasonable accommodation and violated Plaintiff's Title VII rights.

130.     Because Plaintiff will be able to establish a prima facie showing, the burden shifts to Defendant to show that it could not accommodate the Plaintiff's religious needs without undue hardship. *Tepper,* at 514. Defendant is unable to make this showing for several additional reasons.

131.     First, upon receiving Plaintiff's request for a religious accommodation, Defendant did not give that request the individualized consideration demanded by Title VII. In the

EEOC's recent Technical Assistance, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (the "COVID-19 Technical Assistance", the EEOC addressed this precise issue.[28] In the COVID-19 Technical Assistance, the EEOC posed the following question: "Under Title VII, how should an employer respond to an employee who communicates that he . . . is unable to be vaccinated . . . because of a sincerely held religious belief." *Id*. at K.12. The EEOC's response was as follows:

> Once an employer is on notice that an employee's sincerely held religious belief, practice, or observance prevents the employee from getting the COVID-19 vaccine, the employer must provide a reasonable accommodation unless it would pose an undue hardship . . . . Under Title VII, an employer should thoroughly consider all possible reasonable accommodations . . . . In many circumstances, it may be possible to accommodate those seeking reasonable accommodations for their religious beliefs, practices, or observances.

*Id*. (emphasis added). Elsewhere in that document, the EEOC identified the types of reasonable accommodations employers must consider when they receive requests for religious accommodations, including "masks," "testing," "telework," "social distancing protocols," "making changes in the work environment (such as [modification] to ventilation systems or limiting contact with other employees and non-employees," and "regular hand washing." *Id*. at K.5.

132.    Here, Defendant failed to "thoroughly consider all possible reasonable accommodations," as required by the EEOC and provided a far cry from the "individualized" assessment required by the EEOC. *Id*. at K.5.

---

[28] *See* https://www.eeoc.gov/newsroom/eeoc-issues-updated-covid-19-technicalassistance, last visited on September 26, 2021.

133.     Second, Defendant cannot show that affording Plaintiff the types of accommodations the EEOC identified in the COVID-19 Technical Assistance as being reasonable in the context of employer vaccination policies—i.e., "masks," "testing," "telework," "social distancing protocols," "making changes in the work environment," "hand washing," etc.—would impose an undue hardship on it.

134.     Third, because of policies implemented by 3M due to COVID-19, Plaintiff Cleckner had been primarily working remotely. Plaintiff Cleckner therefore posed little to no threat of either catching or transmitting COVID-19 to or from fellow employees.

135.     Defendant cannot show that allowing Plaintiff to continue in her position as she had been successfully doing, let alone denying alternative reasonable accommodations such as masking, would have imposed an undue hardship.

136.     Fourth, evidence available at the time Plaintiff was terminated, reinforced by evidence that has come forth since, demonstrates that the COVID-19 vaccine is ineffective at preventing both infection and transmission. Declining to take the vaccine could therefore not cause any legitimate burden on 3M employees or its operation.

137.     As such, Defendant has violated Plaintiff's rights under Title VII by discriminating against them on the basis of her religious beliefs and failing to provide reasonable accommodation.

## SECOND CAUSE OF ACTION
### Disability Discrimination
### [Violation of the Americans with Disabilities Act; 42 U.S.C. § 12010 et seq.]

138.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

139.     The Americans with Disabilities Act of 1990, set forth in 42 U.S.C. §§ 12010 et

seq. (hereinafter the "ADA Act") prohibits any covered entity from "discriminat[ing]

against a qualified individual on the basis of disability in regard to job application

procedures, the hiring, advancement, or discharge of employees, compensation, job

training, and other terms, conditions, and privileges of employment. 42 U.S.C. §

12112(a).

140.     Under the ADA, an individual has a protected disability if he or she either has a

"physical or mental impairment that substantially limits one or more major life activities

…" (ADA Act, § 12102(1)(A)), or is: "*being regarded as having such an impairment* []."

(*Id.,* at subparagraph (C)) (emphasis added).

141.     Under section 12102(3)(A) of the ADA Act: "An individual meets the

requirement of 'being regarded as having such an impairment', if the individual

establishes that he or she has been subjected to an action prohibited [by the ADA]

because of an actual or perceived physical or mental impairment whether or not the

impairment substantially limits, or is perceived to substantially limit, a major life

activity." (See also, 28 Code of Federal Regulations ("C.F.R.") §§ 35.108(f)(1) and

36.105(f)(1).)

142.     "An employer who fails to make 'reasonable accommodations to the known

physical or mental limitations of an [employee] with a disability' discriminates '*unless'*

the employer 'can demonstrate that the accommodation would impose an *undue hardship*

on the operation of [its] business.' " *US Airways, Inc. v. Barnett,* 535 U.S. 391, 395

(2002) (quoting 42 U.S.C. § 12112(b)(5)(A)) (emphasis added). The burden of

persuasion falls on the employer.

143.    An employer has a duty under the ADA to engage in an "interactive process" with the employee to determine whether, based on an *individualized assessment* of the employee's needs, a reasonable accommodation is possible.

144.    Defendant failed to engage in an interactive process with Plaintiff and to conduct an individualized assessment of her unique circumstances.

145.    3M discriminated against Plaintiff based on a perceived disability: being unvaccinated.

146.    Defendant regarded unvaccinated individuals as being "disabled" and unable to perform the duties of their employment.

147.    Based on this perceived disability, Defendant discriminated against Plaintiff by threatening termination if she failed to receive the COVID-19 vaccine, a "condition" regarded as a disability under 3M's policy.

148.    Plaintiff was constructively terminated due to her COVID-19 vaccination status, despite the fact that Plaintiff has successfully performed her same respective positions from which she was just removed since before COVID-19 was introduced to the world.

149.    By pattern and practice, virtually every employer in America has shown that reasonable accommodations and alternatives to vaccination indeed exist for employees, and these have been required all along since the inception of COVID: self-screening with temperature checks, wearing personal protective equipment (PPE), and complying with other various safety protocols until the number of COVID infections reduced to acceptable levels.

150.     Defendant cannot show that offering alternative, less-intrusive accommodations would cause an undue hardship, for the same reasons outlined in the context of Defendant's religious discrimination.

151.     Defendant's failure to provide accommodations has harmed and continues to harm Plaintiff.

152.     By failing to engage in the interactive process, offer any reasonable accommodation, and constructively terminating Plaintiff based on her medical decision, Defendant's discriminatory actions were in violation of the ADA.

### THIRD CAUSE OF ACTION
**Religious Discrimination**
**[Violation of the Pennsylvania Human Relations Act; 43 P.S. § 955(a)]**

153.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

154.     The Pennsylvania Human Relations Act declares that it is unlawful "[f]or any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability of any individual to refuse to hire or employ, or to bar or to discharge from employment such individual, or to otherwise discriminate against such individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment, if the individual is the best able and most competent to perform the service required." 43 P.S. § 955(a).

155.     Defendant had a "duty under the Pennsylvania Human Relations Act (PHRA) to engage in a meaningful dialogue with applicant to determine if a reasonable accommodation could be made for him." *Stultz v. Reese Bros.*, 2003 PA Super 408, 835 A.2d 754, 763 (2003).

156.     Plaintiff asserted bona fide religious beliefs that conflicted with 3M's mandatory vaccine policy and notified 3M of those beliefs by filing an exemption and accommodation request per 3M's policies.

157.     Defendant 3M utterly failed to offer any reasonable accommodation, failed to engage in the interactive process with Plaintiff, failed to perform an individualized assessment of Plaintiff's request, and ultimately denied Plaintiff's religious exemption.

158.     By denying reasonable accommodation and executing punitive measures against Plaintiff, Defendant discriminated against Plaintiff due to her religious beliefs.

159.     On these facts, Plaintiff establishes a prima facie case that shows Defendant failed to make any reasonable accommodation and violated Plaintiff's Title VII rights.

160.     Because Plaintiff will be able to establish a prima facie showing, the burden shifts to Defendant to show that it could not accommodate the Plaintiff's religious needs without undue hardship. *Tepper,* at 514. Defendant is unable to make this showing for several reasons.

161.     Defendant cannot show that allowing Plaintiff to continue in her position as she had been successfully doing, let alone denying alternative reasonable accommodations such as masking, would have imposed an undue hardship.

162.     Fourth, evidence available at the time Plaintiff was terminated, reinforced by evidence that has come forth since, demonstrates that the COVID-19 vaccine is ineffective at preventing both infection and transmission. Declining to take the vaccine could therefore not cause any legitimate burden on 3M employees or its operation.

163.      As such, Defendant has violated Plaintiff's rights under Title VII by

discriminating against her on the basis of her religious beliefs and failing to provide

reasonable accommodation.

### FOURTH CAUSE OF ACTION
**Disability Discrimination**
**[Violation of the Pennsylvania Human Relations Act; 43 P.S. § 955(a)]**

164.      Plaintiff hereby incorporates by reference the allegations contained in the

preceding paragraphs as if fully set forth herein.

165.       Defendant also discriminated against Plaintiff on the basis of disability in

violation of the Pennsylvania Human Rights Act.

166.      The PHRA defines "disability" as "**(1)** a physical or mental impairment which

substantially limits one or more of such person's major life activities; **(2)** a record of

having such an impairment; or **(3)** *being regarded as having such an impairment*." 42

Pa. Stat. § 954 (emphasis added).

167.       Defendant perceived Plaintiff as disabled due to her lack of vaccine-induced

immunity, incorrectly decided that she was unfit to perform her job as a result and

took adverse employment action against her.

168.      Plaintiff was infected by and recovered from SARS-CoV-2 and thus likely has

natural immunity.

169.       By perceiving Plaintiff as disabled due to her unvaccinated status, Defendant

engaged in discriminatory activity by failing to conduct an individualized assessment

and reasonably accommodate Plaintiff on the basis of her actual and perceived

disabilities.

170.    Defendant cannot show that offering alternative, less-intrusive accommodations would cause an undue hardship, for the same reasons enumerated above.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for the following relief:

a. A finding that Plaintiff has a fundamental right to her bodily autonomy, and to make health decisions in accordance with her beliefs and conscience.

b. A finding that Defendant discriminated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Pennsylvania Human Rights Act.

c. Enjoin Defendant from taking any further adverse employment action against Plaintiff;

d. Enjoin Defendant from taking any similar discriminatory adverse employment action against any other 3M employee;

e. An order that Plaintiff be compensated, to the extent allowable under Pennsylvania state and Federal law, for her monetary damages;

f. An order that Defendant pays Plaintiff's costs associated with bringing this lawsuit, including her reasonable attorneys' fees and costs; and

g.  A grant of any such further relief as the Court deems necessary and proper in the public

interest.

DATED: December 27, 2022

Respectfully submitted,

Jonathan W. Crisp, Esq.
PAID 83505
4031 North Front Street
Harrisburg, PA 17110
Telephone: 717-412-4676
Facsimile: 717-412-4679
Email: jcrisp@crisplegal.com

Robert E. Barnes, Esq.
*Subject to admission pro hac vice*
235010/CA
Lexis Anderson, Esq.
*Subject to admission pro hac vice*
BARNES LAW
700 South Flower Street, Suite 1000
Los Angeles, California 90017
Telephone: (310) 510-6211
Facsimile: (310) 510-6225
Email: robertbarnes@barneslawllp.com

**Counsel for Plaintiff HANNAH
ROMAINE CLECKNER**