## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HANNAH ROMAINE CLECKNER, | : | Civil No. 1:22-CV-02055 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| 3M COMPANY, | : | |
| | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Plaintiff, Hannah Cleckner ("Cleckner"), has sued her former employer, Defendant 3M Company ("3M"), for alleged religious discrimination after she was fired for failing to comply with 3M's COVID-19 vaccine requirement. Presently before the court is a motion for summary judgment and a motion for sanctions filed by 3M. In resolving the summary judgment motion, the court must determine whether Cleckner has met her burden of establishing a *prima facie* case of religious discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"). The court must also determine if 3M has proven there is no genuine dispute of material fact that 3M would have suffered an undue hardship if it accommodated Cleckner's request for a religious exemption to its vaccine requirement. For the reasons that follow, the court will grant summary judgment in 3M's favor and, consequently, deny without prejudice the motion for sanctions.

## BACKGROUND

**A.    Federal Rule of Civil Procedure 56(c)(1) and Local Rule 56.1**

A threshold issue arises in considering the facts of this matter. In support of its motion for summary judgment, 3M filed a statement of material facts. (Doc. 70-3.) As required by Local Rule 56.1, Cleckner filed a response in which she either admitted or disputed each paragraph of 3M's statement. (Doc. 82.) 3M argues that Cleckner's response fails to comply with Local Rule 56.1 and Federal Rule of Civil Procedure 56(c)(1) due to Cleckner's failure to cite record evidence in disputing 3M's facts. (Doc. 84, pp. 1–3.)[1] Due to this purported non-compliance, 3M argues that all paragraphs in its statement of material facts should be deemed admitted.

The court partially agrees with 3M. Certain "disputed" facts will be deemed admitted due to Cleckner's failure to comply with Rule 56(c)(1) and Local Rule 56.1. Cleckner's response to 3M's statement of material facts does not dispute many of 3M's averments. These facts, of course, are admitted. When Cleckner does dispute facts, she provides an objection that takes one of three forms. For some facts, Cleckner makes a counter assertion and provides a citation to record evidence. (*See, e.g.*, Doc. 82 ¶ 51.) This type of response is plainly sufficient under Rule 56. *See* Fed. R. Civ. P. 56(c)(1)(A). For others, Cleckner claims that

---

[1] For ease of reference, the court uses the page numbers from the CM/ECF header.

3M mischaracterizes Cleckner's deposition testimony and generally explains how it is a mischaracterization.  (*See, e.g.*, *id.* ¶¶ 84, 88, 100.)  This type of response is also sufficient under Rule 56.  *See* Fed. R. Civ. P. 56(c)(1)(B).

The third type of response is where Cleckner fails to put facts into dispute. For many facts to which she objects, Cleckner simply responds without elaboration:  "Plaintiff disputes this statement."  This response fails to comply with Rule 56(c)(1), because Cleckner neither cites record evidence nor makes any showing that the materials 3M proffers do not support its assertion.  *See* Fed. R. Civ. P. 56(c)(1).  So, too, this response contravenes Local Rule 56.1, which requires reference to the parts of the record that support nonmovant's objection to facts asserted by the movant.  M.D. Pa. L.R. 56.1.  Cleckner's failure to "appropriately challenge the material facts tendered by [3M] means that those facts must be deemed" admitted.  *Kuhn v. Capitol Pavilion*, No. 11-CV-2017, 2012 WL 5197551, at *9 (M.D. Pa. Oct. 19, 2012).  Accordingly, the court deems admitted all facts in 3M's statement of material facts to which Cleckner only responded, "Plaintiff disputes this statement."[2]

---

[2] Based on this ruling, the court specifically deems admitted the following paragraphs of 3M's statement of material facts: 49(f), 89, 94, 95, 96, 98, 99, 101, 102, 103, 104, 106, 107, 109, 110.

**B. Factual Background**

      **1. Cleckner's Employment at 3M**

Cleckner's employment at 3M began in 2018 after 3M bought her then-employer. (Doc. 70-3, ¶ 1.) Cleckner worked in 3M's Health Care Business Group. (*Id.*) Specifically, Cleckner was a Patient Support Specialist, whose primary responsibility was "representing 3M's V.A.C. Therapy System at healthcare facilities." (*Id.* ¶¶ 6–7.) The V.A.C. Therapy System is a medical device that promotes wound healing by "delivering negative pressure (a vacuum) to the wound through a proprietary dressing and therapy unit." (*Id.* ¶ 2.) Patients use this system in a variety of settings—including their own homes, "acute care facilities, ambulatory surgical centers, and assisted living facilities"—as they are "recovering from surgery or . . . serious injury or disease." (*Id.* ¶¶ 3–4.)

      As part of her employment, Cleckner performed a variety of tasks designed to promote the use of the V.A.C. Therapy System and to support both patients and healthcare facilities using the device. For instance, Cleckner would learn about patients' wounds and advise whether the V.A.C. Therapy System would help their recovery. (*Id.* ¶ 10.) She performed in-person trainings to show healthcare personnel how to use and troubleshoot the system and to discuss its benefits. (*Id.* ¶ 13.) Cleckner also assisted patients in transitioning from healthcare facilities to their home with a V.A.C. Therapy System. (*Id.* ¶ 11.) Finally, Cleckner also was

responsible for managing the inventory of V.A.C. Therapy Systems, which involved "identify[ing] each unit at a healthcare facility, confirm[ing] its location, and confirm[ing] its condition." (*Id.* ¶ 16.)

### 2. COVID-19 Vaccination Mandates and 3M's Response

At the outset of the COVID-19 pandemic, healthcare facilities began prohibiting third-party vendors, like Cleckner, from entering their premises. (*Id.* ¶ 18.) So, Cleckner was forced to do most of her work remotely. (*See id.*) This began to change when the first COVID-19 vaccines began rolling out in spring 2021, at which point 3M and healthcare facilities began expecting patient support specialists to function as they did pre-pandemic. (*Id.* ¶ 19.)

During the autumn following the release of the COVID-19 vaccines, the federal government issued two vaccine mandates, one of which is relevant to the present matter.[3] The relevant mandate was an interim final rule issued by the Centers for Medicare and Medicaid Services ("CMS Mandate"). The CMS Mandate required facilities that participate in Medicare and Medicaid to "ensure

---

[3] The other mandate arose from Executive Order 14042, which required a previously created task force to issue guidance on "adequate COVID-19 safeguards" that federal contractors would have to follow. *Georgia v. Biden*, 574 F. Supp. 3d 1337, 1343–44 (S.D. Ga. 2021), *aff'd in part and vacated in part on other grounds sub nom.*, *Georgia v. President of the U.S.*, 46 F.4th 1283 (11th Cir. 2022); Exec. Order No. 14042, 86 Fed. Reg. 50985 (Sept. 9, 2021). The guidance ultimately issued by the task force would have required all federal contractors to ensure that their employees were fully vaccinated against COVID-19. *Georgia v. Biden*, 574 F. Supp. 3d at 1344. This mandate was ultimately enjoined nationwide for the time relevant to this lawsuit. *See id.* at 1357.

that their covered staff are vaccinated against COVID-19." *Biden v. Missouri*, 595

U.S. 87, 91 (2022); 86 Fed. Reg. 61555-01 (Nov. 5, 2021). In response to the

CMS Mandate, 3M required its employees who were expected to work in person at

facilities covered by the CMS Mandate to get vaccinated. (*See* Doc. 70-3, ¶ 29.)

Nevertheless, the CMS Mandate did not cover those employees who had medical

or religious exemptions. *Biden v. Missouri*, 595 U.S. at 91. Thus, 3M instituted a

process "by which employees could seek exemptions." (Doc. 70-3, ¶ 34.)

### 3. 3M's Exemption Request Process

Under 3M's process, employees seeking an exemption were required to

submit a request through an online portal. (*Id.* ¶ 35.) The request form included a

series of eleven questions, the following three of which are relevant here:

> 1. Please specify the religious belief, practice, or observance that is the basis for your request for accommodation.
>
> 2. Please state how your sincerely held religious belief, practice, or observance conflicts with the Federal vaccination mandate.
>
> 3. Please describe the specific accommodation(s) that you are requesting at this time, including an explanation of how the requested accommodation(s) will enable you to meet your religious obligations without impacting your ability to meet the required or essential functions of your job. Please include the duration of the accommodation needed.

(*Id.* ¶ 38.) Employee requests were evaluated by a calibration team made up of 5

human-relations employees. (*Id.* ¶ 40.) If the calibration team required additional

information, employees had the opportunity to clarify their answers and provide more detail.  (*Id.* ¶ 39.)

### 4.  Cleckner's First Attempt to Obtain a Religious Exemption

Cleckner first attempted to obtain a religious exemption in October and November 2021.  (*Id.* ¶¶ 43–44.)  Cleckner's request provided narrative answers to the three questions quoted above.  (*See* Doc. 70-2, pp. 512–13.)  In response to the first question, which asked her to identify the religious basis for her request, Cleckner simply stated that she is seeking an exemption under Title VII and described what Title VII prohibits.  (*Id.* at 512.)

In response to the second question, which asked her to explain how her beliefs conflict with the vaccine mandate, Cleckner provided the following answer:

> I have been praying to God for guidance during these unprecedented times as it has been extremely difficult in many ways.  I am a Christian and have a strong personal faith where He has provided me with comfort and led me down paths I wouldn't have been able to handle alone.
>
> With this being said, I am writing to request a religious exemption from 3M's Covid shot mandate.  I trust in God for my health and seek Him for protection from any illness.  'Trust in the Lord with all your heart and lean not on your own understanding.' (Proverbs 3:5).  God will continue to test my faith with struggles, so if I get sick, that is in His control and it may not always make sense in that moment.  Healing comes from prayer and if it's God's will, I will be healed regardless of any medications, any shots, etc.
>
> In addition, any man-made vaccine that contains adjuvants that alter our immune response is interfering with how God made us.  He made us perfect in His image.  The Covid shot is an mRNA vaccine where it

teaches our cells to make the spike protein.  We should not be altering or training our cells in any way as no one knows how God made our cells to respond.  'It is better to trust in the Lord than to put confidence in man.' (Psalm 118:8)

God has given me clear direction to not receive this shot and I trust in my relationship with Him.  Thank you for your consideration regarding this exemption.

(*Id.* at 512–513.)  In response to question three, which asked her to identify the

specific accommodation she was requesting, Cleckner responded:

I am requesting a permanent religious exemption from 3M's Covid vaccine mandate.  I believe that I can still effectively and efficiently fulfill my job duties without being vaccinated.  If any of my accounts do not allow me in due to their own restrictions, I can still perform my job requirements at a high level.  This was demonstrated by my performance over the 2020-2021 timeframe where all facilities shut down not allowing any vendors in.

(*Id.* at 513.)  Finally, in response to another question, Cleckner stated that she had

received vaccinations in the prior 10 years.  (*Id.* at 513, 537.)

3M's calibration team sought more information from Cleckner.  (*See* Doc.

70-3, ¶ 44.)  3M asked Cleckner to explain (1) how the COVID-19 vaccine is

different from other vaccines she has not declined and (2) how she learned about

the scripture passages she cited in her request, the context in which the passages

arise in scripture, and how they relate to the COVID-19 vaccine.  (Doc 70-2, p.

523.)  With respect to the former, Cleckner stated, "[f]or all decisions I need to

make in my life, including medical treatments, I seek God's wisdom through

prayer.  Each medical decision is independent of one another and is dictated by the

8

way the Holy Spirit moves on my heart." (*Id.*)  With respect to the latter, Cleckner

responded:

> I pray to God daily and even more so during these unprecedented times.
> The scripture I quoted in my exemption was placed on my heart and I
> stated in my exemption where in the Bible these scriptures are
> referenced (Proverbs 3:5 and Psalm 118:8).  When I need to make
> important life decisions I bring them to God in prayer and follow His
> leading [sic] as how futile it is to trust man more than God.  As
> mentioned above, for all decisions I need to make in my life, including
> medical treatments, I seek God's wisdom through prayer.  Again, each
> medical decision is independent of one another and is dictated by the
> way the Holy Spirit moves on my heart.  God has given me clear
> direction to not receive any COVID shots available and I trust in my
> personal relationship with Him.  If I were to disobey His Word, I would
> be sinning and putting my relationship with God at risk.

(*Id.*)  In late November, 3M notified Cleckner that it was denying her exemption

request.  (*Id.* at 527.)  3M denied Cleckner's request on the basis that she failed to

establish she had a religious belief that prevented her from getting the vaccine.

(Doc. 70-3, ¶ 47.)

3M ultimately paused its vaccination requirements as the legality of the

CMS Mandate was being litigated.  *See generally Biden v. Missouri*, 595 U.S. at

95–96 (staying lower courts' injunctions against CMS Mandate); *Missouri v.

Biden*, 571 F. Supp. 3d 1079, 1104 (E.D. Mo. 2021) (entering preliminary

injunction enjoining enforcement of CMS Mandate); *Louisiana v. Becerra*, 571 F.

Supp. 3d 516, 543–44 (W.D. La. 2021) (same).  Once the dust settled on those

challenges, 3M notified employees who performed work at facilities covered by

the CMS Mandate, like Cleckner, that they would have to get vaccinated or have an approved exemption by late May 2022.  (*Id.* ¶ 29.)

### 5.  Cleckner's Second Attempt to Obtain a Religious Exemption

On April 25, 2022, Cleckner again sought a religious exemption to 3M's vaccination requirement.  (*Id.* ¶ 50.)  This time, she sent a letter via email to 3M's vaccine accommodations email address.  (*Id.*)  Cleckner's letter identifies many of the same beliefs that she identified in her first exemption request, *e.g.*, making "[e]ach medical decision . . . independent[ly] of one another" based on "the way the Holy Spirit moves on [her] heart."  (Doc. 70-2, p. 507.)  Yet, Cleckner also identified a new religious belief animating her request:

> I am a Christian who has a strong faith where I put trust in God for my health and seek Him for protection from any illness.  "*Trust in the Lord with all your heart and lean not on your own understanding*." (Proverbs 3:5).  My religious beliefs prohibit me from receiving any gene therapy injection, commonly known as Pfizer-BioNTech, Comirnaty, Janssen by Johnson and Johnson, Moderna-Lonza mRNA-1273, Vaxzevria by Astrazeneca or any other vaccine containing DNA, mRNA, aborted fetal cells or any other toxic components.  My faith does not allow me to participate in or benefit from abortion in any way.  All the available Covid "vaccines" either contain or are connected to the aborted fetal cell lines HEK-293 and PER.C6.  "*Before I formed you in the womb I knew you, before you were born, I set you apart; I appointed you as a prophet to the nations*." (Jeremiah 1:5)  "*Do you not know that your bodies are temples of the Holy Spirit, who is in you, whom you have received from God? . . . Therefore honor God with your bodies*." (Corinthians 6:19).  I will not disobey God by receiving a shot or vaccine that isn't clean.

(*Id.*)  3M's calibration team never reviewed this second letter because its system automatically appended it to Cleckner's already-denied request.  (Doc. 70-3, ¶ 56.) Cleckner never complied with 3M's vaccination policy, and 3M terminated her employment.  This lawsuit followed.

### C. Procedural History

Cleckner filed the instant lawsuit on December 27, 2022.  (Doc. 1.)  She initially brought claims for religious discrimination in violation of Title VII and the PHRA, and disability discrimination in violation of the Americans with Disabilities Act and the PHRA.  (*Id.*)  The court dismissed with prejudice Cleckner's disability discrimination claims due to her failure to exhaust administrative remedies.  (Docs. 32 & 33.)

Two motions are currently pending before the court.  The first is 3M's motion for summary judgment on the religious discrimination claims.  (Doc. 70.) The second is a motion for sanctions pursuant to Federal Rule of Civil Procedure 37(e), which 3M filed prior to its motion for summary judgment.  (Doc. 57.)  Both motions are full briefed and ripe for review.  (*See* Docs. 58, 61, 64,70-3, 73, 78, 82, 84.)

## JURISDICTION

This court has subject matter jurisdiction over Cleckner's federal law claims pursuant to 28 U.S.C. § 1331 and over her state law claims pursuant to 28 U.S.C. § 1367(a).  Venue is proper in this court pursuant to 28 U.S.C. § 1391(b).

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary."  *Id.*  "A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case."  *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).  The court may not "weigh the evidence" or "determine the truth of the matter."  *Anderson*, 477 U.S. at 249.  Instead, the

court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**DISCUSSION**

Title VII provides that it is unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). The PHRA similarly prohibits employers from discriminating against employees on the basis of "religious creed." 43 Pa. Stat. § 955. Claims under both statutes are generally treated as co-extensive. *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006). In order to succeed on her claims, Cleckner must show: "(1) [s]he held a sincere religious belief that conflicted with a job requirement, (2) [s]he informed [her] employer of the conflict, and (3) [s]he was disciplined for failing to comply with the conflicting requirement." *Fallon v. Mercy Catholic Med. Ctr. of Se. Pa.*, 877 F.3d 487, 490 (3d Cir. 2017).

3M argues it is entitled to summary judgment for two reasons. The first is that Cleckner has failed to establish that she (1) had a sincerely held religious belief that conflicted with a job requirement and (2) informed 3M of that belief. The second is that 3M has proven that providing accommodations to Cleckner

would have subjected it to an undue hardship. The court addresses these arguments in turn.

## A. Whether Cleckner Had Sincerely Held Religious Beliefs

The court first considers whether Cleckner has sufficiently shown that she had a sincerely held religious belief that conflicted with 3M's vaccination policy. This inquiry does not give the court license to question "the truth or falsity of an announced article of faith." *Africa v. Pennsylvania*, 662 F.2d 1025, 1030 (3d Cir. 1981); *accord Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."). After all, "[j]udges are not oracles of theological verity." *Africa*, 662 F.2d at 1030. Accordingly, the only relevant questions in this analysis are (1) whether Cleckner's beliefs were religious in nature and (2) whether she sincerely held those beliefs. *Id.*

### 1. Nature of Cleckner's Beliefs

The Third Circuit has devised a three-factor test for determining if beliefs are religious in nature. *Africa*, 662 F.2d at 1032. Religious beliefs (1) "address[] fundamental and ultimate questions having to do with deep and imponderable matters"; (2) are "comprehensive in nature," not simply "isolated teaching[s]"; and (3) "can be recognized by the presence of certain formal and external signs." *Id.*;

*accord Fallon*, 877 F.3d at 491.  3M argues that the beliefs Cleckner professed in her exemption requests are not religious under the *Africa* test.  (Doc. 73, pp. 12–16.)  In applying *Africa* here, the court finds it necessary to analyze separately the beliefs Cleckner identified in her first exemption request and her second.

### i.  First Exemption Request

In her first request, Cleckner professed that since she believed she should not "alter[] or train[] [her] cells in any way," she also believed that she could not take the COVID-19 vaccine due its containing "adjuvants that alter [the] immune system."  (Doc. 70-2, p. 512.)  In her follow-up responses, Cleckner clarified that this belief specifically applied to the COVID-19 vaccine.  She explained that "each medical decision [she makes] is independent of one another and is dictated by the way the Holy Spirit moves on [her] heart" and that "God has given [her] clear direction to not receive any COVID shots available."  (*Id.* at 523.)

These beliefs, although couched in religious language, are not religious under the *Africa* test, for two reasons.  First, Cleckner's beliefs are not comprehensive in nature.  By Cleckner's own account, her beliefs against altering her immune system are specifically applicable to the COVID-19 vaccine, and not necessarily to other medical treatments, since she makes each medical decision independently of one another.  Cleckner's ultimate animating belief, then, is essentially that she must consult with God on every medical decision and act

16

according to His will as she divines it. But, this belief is similar to those that other courts in this circuit have found to be an isolated moral commandment. *Cf. Fallon* 877 F.3d at 492 (finding that plaintiff's belief that he should do not harm to his body was a "general moral commandment"); *Blackwell v. Lehigh Valley Health Network*, No. 5:22-CV-03360, 2023 WL 362392, at *8 (E.D. Pa. Jan. 23, 2023) (concluding that plaintiff's belief against "insertion of an unwanted foreign object into her body" was an "isolated moral teaching"); *Finkbeiner v. Geisinger Clinic*, 623 F. Supp. 3d 458, 465–66 (M.D. Pa. 2022) (determining plaintiff's "belief that she has a 'God given right to make [her] own choices'" was an "isolated moral teaching"). Cleckner does not meaningfully address why these beliefs are comprehensive in nature, instead relying on conclusory statements that such beliefs are religious. (Doc. 78, p. 10.)

Second, Cleckner's beliefs are so flexible and self-defining that, if afforded legal protection, they would amount to a "blanket privilege" that she could use to avoid many unwanted legal obligations. *Africa* warned that "'the very concept of ordered liberty precludes allowing' [plaintiff], or any other person, a blanket privilege 'to make his own standards on matters of conduct in which society as a whole has important interests.'" *Africa*, 662 F.2d at 1031 (quoting *Wisconsin v. Yonder*, 406 U.S. 205, 215–16 (1972)). In this respect, Cleckner's beliefs are similar to those that other courts in this circuit have determined constitute such a

blanket privilege.  *Cf. Caruano v. Bayhealth Med. Ctr., Inc.*, 714 F. Supp. 3d 461, 469 (D. Del. 2024) ("Allowing Plaintiff the ability to object to anything that 'goes against God's will' or her 'conscience' would amount to the type of 'blanket privilege' that does not qualify as religious belief under *Africa*."), *aff'd sub nom.*, *McDowell v. Bayhealth Med. Ctr., Inc.*, No. 24-1157, 2024 WL 4799870 (3d Cir. Nov. 15, 2024); *Ulrich v. Lancaster Gen. Hosp.*, Civil No. 22-4945, 2023 WL 2939585, at *5 (E.D. Pa. Apr. 13, 2023) ("Her reliance upon a divine 'command ... to exercise bodily autonomy,' and assertion that 'God has given [her] liberty to live according to . . . His calling,' asserts . . . a 'blanket privilege' where she alone is the arbiter for decisions which she expects her employer to 'unfailingly respect.'"); *Finkbeiner*, 623 F. Supp. 3d at 465 ("[Plaintiff's] belief that she has a 'God given right to make [her] own choices'—which, implicitly, her employer must unfailingly respect—would amount to 'a blanket privilege' and a 'limitless excuse for avoiding all unwanted ... obligations.'") (internal footnotes and citations omitted).  Nowhere in her brief does Cleckner meaningfully address this "blanket privilege" issue.

For these two reasons, the beliefs that Cleckner professes in her first exemption request are not religious under the *Africa* test.  Therefore, Cleckner has not made out a *prima facie* case for religious discrimination to the extent that her claims rely on the beliefs professed in her first exemption request.

### ii. Second Exemption Request

Cleckner's second exemption request is different.  In that request, Cleckner stated that her objection to the COVID-19 vaccine arises from her religious objection to abortion.  She explained that her Christian "faith does not allow [her] to participate in or benefit from abortion in any way" and cites several Bible verses that she interprets to support this belief.  (Doc. 70-2, p. 507.)  She then averred that she cannot take any COVID-19 vaccine, because "[a]ll [of] the available Covid 'vaccines' either contain or are connected to the aborted fetal cell lines HEK-293 and PER.C6."  (*Id.*)

Courts in this circuit have determined that similar abortion-related beliefs are religious under *Africa*.  *Glover v. Children's Hosp. of Phila.*, Civil. No. 23-0463, 2025 WL 1527494, at *5 (E.D. Pa. May 29, 2025); *Gray v. Main Line Hosps., Inc.*, 717 F. Supp. 3d 437, 444, 447 (E.D. Pa. 2024); *Bushra v. Main Line Health, Inc.*, 709 F. Supp. 3d 164, 174 (E.D. Pa. 2023); *Shields v. Main Line Hosps., Inc.*, 700 F. Supp. 3d 265, 273 (E.D. Pa. 2023); *cf. Aiken v. Bayhealth Med. Ctr., Inc.*, Civil No. 23-37, 2024 WL 278182, at *4 (D. Del. Jan. 25, 2024) ("Other district courts handling similar religious discrimination cases involving the COVID-19 vaccine have found that religious beliefs condemning abortion and murder, when adequately pled, are sufficient to survive at the motion to dismiss stage.").  Although 3M argues that Cleckner's other beliefs are not religious, it is

silent on whether her abortion-related beliefs are religious.  In any event, the court

agrees with the above-cited caselaw that such beliefs satisfy the *Africa* factors.

### 2.  Sincerity of Cleckner's Religious Beliefs

The question then becomes whether Cleckner's religious beliefs are

sincerely held.  That is a question of fact.  *Shields*, 700 F. Supp. 3d at 270.

Cleckner has provided evidence that she sincerely held her religious beliefs,

namely her second exemption request letter, Doc. 70-2, p. 507, and deposition

testimony, *see* Pl. Dep. 120:16–121:15.[4]  Conversely, 3M cites to a bevy of

evidence that suggests Cleckner's beliefs were not sincerely held.  For instance,

3M proffers several examples of communications sent by Cleckner in which she

explains her objections to the COVID-19 vaccine, none of which mention the

vaccines' use of fetal cells in development.  (Doc. 70-3, ¶ 59(a)–(i).)  3M also

points to portions of Cleckner's deposition during which she testified, *inter alia*,

that she had never previously refused a vaccine on religious grounds, that she had

considered getting a COVID-19 vaccine when they first came out, and that her

religion has no view on medical care.  (Doc. 70-3, ¶¶ 69, 70, 80.)

In support of its position that no genuine dispute of material fact exists on

this issue, 3M cites one nonprecedential Third Circuit case, *Kennedy v. Pei-*

---

[4] Citations to "Pl. Dep." refer to the transcript of Cleckner's deposition, which is found at Doc. 70-2, pp. 179–304.

*Genesis*, No. 24-1563, 2025 WL 602159 (3d Cir. Feb. 25, 2025). (Doc. 73, p. 17.)

The court does not find this case controlling here. In *Kennedy*, the Third Circuit

affirmed the district court's summary judgment ruling that the plaintiff's beliefs

were not religious under *Africa*. *Kennedy*, 2025 WL 602159, at *1. The court has

already found that Cleckner has established her beliefs are religious under *Africa*.

3M also cites two district court opinions in support of its argument, *Aukamp-*

*Corcoran v. Lancaster General Hospital*, Civil No. 19-5734, 2022 WL 507479

(E.D. Pa. Feb. 18, 2022); and *Geerlings v. Tredyffrin/Easttown School District*, No.

21-CV-4024, 2021 WL 4399672 (E.D. Pa. Sept. 27, 2021). (Doc. 73, pp. 17–18.)

The court acknowledges that these cases are not totally inapposite. In *Aukamp-*

*Corcoran*, the court found at summary judgment that the plaintiff's religious

beliefs were not sincerely held when the plaintiff's beliefs "developed shortly

before her exemption request was submitted." 2022 WL 507479, at *4. Some

evidence that 3M cites might suggest the same is true for Cleckner. (*See, e.g.*,

Doc. 70-3, ¶ 59(a) (describing text in which Cleckner stated that her "only

reservation" about the COVID-19 vaccine was its potential effect on fertility).)

In *Geerlings*, the court denied the plaintiffs' request for emergency

injunctive relief to enjoin a school's mask mandate. 2021 WL 4399672, at *10.

The court reasoned that the plaintiffs did not have a likelihood of success on the

merits, in part, because one of the plaintiffs "arrived at her feelings toward face

coverings on her own and in response to the recent pandemic." *Id.* at *6. This fact, according to the *Geerlings* court, "contribute[d] to an impression that her belief is an 'excuse for avoiding ... unwanted legal obligations.' *Id.* (quoting *Africa*, 662 F.2d at 1030). *Geerlings* at least implicitly supports the same proposition as *Aukamp-Corcoran*, *i.e.*, that beliefs are less likely to be sincerely held when they are developed shortly before an exemption request. *See id.*

Yet, the court finds other cases that have reserved the issue of sincerity for the jury more analogous to the one at bar. In *Shields*, for example, the court at summary judgment refused to determine whether a plaintiff's abortion-related religious beliefs were sincerely held, even though the plaintiff was contemporaneously taking medications that were tested on fetal tissues. 700 F. Supp. 3d at 273. So, too, the *Bushra* court did not even consider at summary judgment whether the plaintiff's religious beliefs on abortion were sincerely held, reasoning that "[i]t is for the jury to determine whether he has a sincerely held religious belief." 709 F. Supp. 3d at 174. The *Glover* court followed a similar tact. It left to the jury a determination on the sincerity of plaintiff's religious beliefs on abortion, even though the defendant argued that the plaintiff's beliefs were not sincere "due to his inconsistent positions with respect to vaccines generally and fetal cells within medicines, as well as because [the plaintiff] did not develop a

belief regarding fetal cells and vaccines until [the defendant] issued its [vaccine] mandate." *Glover*, 2025 WL 1527494 (internal quotation marks omitted).

On this issue, the court agrees with the reasoning of *Shields*, *Bushra*, and *Glover*. The sincerity of Cleckner's beliefs is quintessentially an issue of fact that requires credibility determinations by a jury. Accordingly, 3M is not entitled to summary judgment on the ground that Cleckner's religious beliefs were not sincerely held.

### B. Whether Cleckner Informed 3M of her Beliefs

To satisfy the second element of a religious discrimination claim, a plaintiff "must give the employer 'fair warning' that a particular employment practice will interfere with that employee's religious beliefs." *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 319 (3d Cir. 2008). Courts "do not charge employers with possessing knowledge about the particularized beliefs and observances of various religious sects." *Id.* Accordingly, it is not enough for a plaintiff to simply announce their religious affiliation, for example, without describing "a particularized religious belief in conflict with an employment requirement." *Id.*

3M argues that Cleckner did not inform it of her religious belief since her beliefs are not religious at all. (Doc. 73, pp. 20–21.) This argument is nothing more than an unpersuasive repackaging of 3M's arguments on the first element of

Cleckner's claims.  3M's argument fails to grapple with the essential question of this element, *i.e.*, whether Cleckner informed 3M of sufficiently particularized beliefs that conflict with 3M's vaccine policy.  In her second exemption request, Cleckner notified 3M that (1) she is a Christian; (2) her faith "does not allow [her] to participate in or benefit from abortion in any way"; and (3) she cannot comply with 3M's vaccine requirements because "[a]ll [of] the available Covid 'vaccines' either contain or are connected to the aborted fetal cell lines HEK-293 and PER.C6."  (Doc. 70-2, p. 507.)  This request provided sufficiently particularized information about Cleckner's beliefs and how they conflict with 3M's requirements.  Accordingly, 3M is not entitled to summary judgment on the ground that Cleckner failed to inform it of her religious beliefs.

In sum, Cleckner has sufficiently established a *prima facie* case of religious discrimination to the extent that her claims rely on her abortion-related religious beliefs.

## C. Whether Accommodating Cleckner Would Have Cause 3M Undue Hardship

3M contends it has proven that providing accommodations to Cleckner would have imposed upon it an undue hardship.  (Doc. 73, pp. 24–31.)  Cleckner seems to have admitted as much factually.  In response to 3M's averment that "accommodating [Cleckner's] Exemption Request would have caused 3M an undue burden," Doc. 70-3, ¶ 49(g), Cleckner stated, "Plaintiff does not dispute this

statement," Doc. 82, ¶ 49(g).  Nevertheless, Cleckner argues in her brief in opposition that 3M would not have been subject to undue hardship if it accommodated her.  (Doc. 78, pp. 14–17.)  Accordingly, the court will interpret Cleckner's factual admission as an inadvertent error and proceed to analyzing the merits of the issue.

As noted, Title VII prohibits employers from discriminating on the basis of "religion."  42 U.S.C. § 2000e-2(a)(1).  The statutory definition of "religion" includes a built-in affirmative defense for employers.  Specifically, the statute provides that "'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).  A showing of undue hardship is "a complete defense" to Cleckner's religious discrimination claims.  *Bushra v. Main Line Health, Inc.*, No. 24-1117, 2025 WL 1078135, at *2 (3d Cir. Apr. 10, 2025).[5]

Courts previously interpreted "undue hardship" to mean "more than a de minimis cost on the employer."  *Webb v. City of Philadelphia*, 562 F.3d 256, 259–

---

[5] To be clear, undue hardship is also a defense to Cleckner's PHRA claims.  *Bushra*, 2025 WL 1078135, at *2 (explaining that "[t]here is no violation of Title VII or the PHRA where an employer" proves accommodating the employee would have caused undue hardship).

60 (3d Cir. 2009).  The Supreme Court, however, has clarified that undue hardship requires a showing of "a burden [that] is substantial in the overall context of the employer's business."  *Groff v. DeJoy*, 600 U.S. 447, 468 (2023).  The analysis is "fact-specific" and requires the court to "take[] into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of [an] employer."  *Id.* at 468, 470–71 (internal quotation marks omitted).  Both economic and non-economic costs are relevant to the undue-hardship analysis.  *EEOC v. Geo Grp., Inc.*, 616, F.3d 265, 273 (3d Cir. 2010); *Bushra*, 709 F. Supp. 3d at 175.  Moreover, "it is appropriate to consider aggregate effects when multiple employees are granted the same accommodation."  *Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 437 (D. Mass. 2021) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 n.15 (1977)).

Cleckner insists that 3M has offered no "concrete evidence of substantial costs increases," but rather just "speculation" of such.  (Doc. 78, p. 16.)  The court disagrees.  3M has offered ample, undisputed evidence to support its undue-hardship defense.  First, 3M has shown that working in-person at healthcare facilities was an important part of 3M maintaining its competitiveness in the market.  This is because employees from competitors were also at healthcare facilities trying to convince patients and providers to use their vacuum therapy

systems.  (Doc. 70-3, ¶ 115.)[6]  If 3M's employees were not at the facilities

advocating for 3M's product, 3M would have become less competitive against

their rivals.  (*Id.*)  Granting Cleckner or other patient support specialists an

exemption would have done little to prevent this loss of competitiveness, because

healthcare facilities were declining to permit vendors' unvaccinated employees on

their premises, irrespective of whether they had an exemption.  (*Id.* ¶ 92.)  In

addition to this competitiveness cost, 3M also showed that the aggregate effect of

approving many exemption requests would have been higher rates of COVID-19 at

3M, which in turn could have led to production disruptions.  (Doc. 70-3, ¶ 110.)[7]

Cleckner refutes none of these facts.  Instead, Cleckner faults 3M for not

proving that every healthcare facility in her region denied access to unvaccinated

employees of vendors.  (Doc. 78, p. 17.)  The fact that 3M did not prove a greater

---

[6] Cleckner claims that 3M offered no evidence to support the facts stated in paragraph 115 of its statement of material fact.  Cleckner is wrong.  3M's assertion is supported by a declaration made under penalty of perjury by Matthew Hahn, one of 3M's then-Regional Sales Leads.  (Doc. 70-2, pp. 311–17.)  Cleckner does not rebut this assertion with any evidence of her own and, thus, fails to put this fact into genuine dispute.

[7] 3M's Healthcare Business Group received 306 religious exemption requests; 3M granted 160 of them.  (Doc. 70-2, p. 326; 70-3, ¶ 108.)  Arguably, the fact that 3M granted this percentage of requests undermines its argument that granting Cleckner's request would have caused it an undue hardship.  *Glover*, 2025 WL 1527494, at *7 (finding genuine dispute of material fact as to undue hardship when "[d]efendant seemingly had no qualms about granting exemptions to other employees whose jobs also involved interacting with patients.")  Nevertheless, Cleckner does not make this argument or even point out that 3M approved approximately 52 percent of requests.  Accordingly, the court does not consider this argument.  *See Scopelliti v. Traditional Home Health & Hospice*, No. 3:18-CV-00040, 2018 WL 1899294, at *5 (M.D. Pa. Apr. 20, 2018) ("This Court is not required to consider arguments that have not been developed by the party advancing them.")

hardship does not negate that 3M has proven an undue hardship. She also faults 3M for failing to prove that Cleckner could not have done some or all of her work duties remotely. (*Id.*) This argument is hardly persuasive, considering Cleckner admitted that "3M considered being in person at the hospitals an important part of her job." (Doc 70-3, ¶ 114; Doc. 82, ¶114.)

Beyond the business-related costs of granting Cleckner an exemption, 3M also proffered evidence of safety-related costs. 3M's unrefuted expert report establishes that it was important for employees in healthcare facilities to be vaccinated, "because they were in regular contact with persons at an increased risk of serious complications and death from COVID-19." (Doc. 70-3, ¶ 104.) That same reports establishes that those working in healthcare facilities were more likely to contract and spread COVID-19. (*Id.* ¶¶ 94, 95.) These realities created risks for 3M employees and patients. As 3M's expert report states: "If 3M were to grant a high percentage of exemptions to customer-facing employees at healthcare facilities, there would be substantial risks of COVID-19 disease, morbidity and mortality to 3M employees, health care personnel at these hospitals, and patients." (Doc. 70-2, p. 346.) Cleckner provides no response to this expert opinion. These undisputed facts make clear that the safety-related costs of accommodation would have constituted an undue hardship as well. Other courts have determined as much under similar circumstances. *Bushra*, 2025 WL 1078135, at *2; *Slattery v. Main*

*Line Health, Inc.*, Civil No. 22-4994, 2025 WL 1758616, at *5–6 (E.D. Pa. June 25, 2025), *appeal docketed*, No. 2396 (3d Cir. July 25, 2025); *Cyr v. Bos. Med. Ctr.*, No. 22-CV-11930, 2025 WL 269239, at *7 (D. Mass. Jan. 22, 2025); *French v. Albany Med. Ctr.*, No. 22-CV-252, 2024 WL 2958461, at *12–14 (N.D.N.Y. June 12, 2024), *appeal docketed*, No. 24-1894 (2d Cir. July 15, 2024); *Aukamp-Corcoran*, 2022 WL 507479, at *6–8.

Finally, 3M has shown that alternatives to requiring Cleckner be vaccinated would not have effectively mitigated these hardships.  First, it is undisputed here that "vaccines were the most effective way to prevent death, serious illness, and transmission of COVID-19."  (Doc. 70-3, ¶ 96.)  Second, it is also undisputed here that 3M would not have been able to ensure on-site compliance with alternative COVID-19 prevention methods, such as masking and social distancing.  (*Id.* ¶ 97.)  Third, it is undisputed that exemptions would have done little to mitigate the business costs described above, because healthcare facilities were denying admittance to unvaccinated vendor employees.  (Doc. 70-3, ¶ 92.)  Finally, Cleckner testified in her deposition that in 2022, she was unwilling to be regularly tested for COVID-19 for non-religious reasons.  (Pl. Dep. 251:23–255:17.)

For these reasons, 3M has shown that there is no genuine issue of fact that accommodating Cleckner's exemption request would have imposed upon 3M an

undue hardship.  Accordingly, 3M is entitled to summary judgment on Cleckner's religious discrimination claims.

## 3M'S MOTION FOR SANCTIONS

The background to 3M's motion for sanctions is well known to the parties, and the court need not recount it here. In short, 3M seeks sanctions for alleged spoliation of electronically stored information pursuant to Federal Rule of Civil Procedure 37(e). The briefing on 3M's motion nearly exclusively focused on whether dismissal of Cleckner's lawsuit with prejudice was an appropriate sanction for Cleckner's alleged spoliation. (*See* Docs. 58 & 61.) That request is moot now that the court has granted summary judgment in 3M's favor. Only in a footnote does 3M argue for alternative sanctions, such as "fees and costs for all discovery letters and motions because of [Cleckner's] conduct," etc. (Doc. 58, p. 26 n.8.) The court will not entertain arguments made in a footnote. *Murphy v. Thomas Jefferson Univ. Hosps., Inc.*, Civil No. 22-4674, 2024 WL 4350328, *6 (E.D. Pa. Sept. 30, 2024); *Summy-Long v. Pa. State Univ.*, No. 06-CV-1117, 2010 WL 4514312, at *2 (M.D. Pa. Nov. 2, 2010). The court also thinks it is improper to consider the appropriateness of these other types of sanctions when Cleckner's brief in opposition focused rightfully, given 3M's briefing, on whether dismissal with prejudice was warranted and did not provide counterarguments concerning other sanctions.

Nevertheless, the court will deny 3M's motion for sanctions without prejudice for two reasons.  First, 3M's motion raises troubling accusations.[8]  For instance, 3M avers that Cleckner reset one of her phones to factory settings about one week after this court ordered her to turn over her phone to 3M's forensic examiner for imaging.  (Doc. 58, p. 9.)   Second, the court recognizes that 3M filed its motion for sanctions without the benefit of knowing how the court would rule on its motion for summary judgment.  It is not clear to the court how its ruling has affected parts of the Rule 37(e) analysis, and needless to say, the parties briefing is silent on the issue.  Accordingly, the court believes the issues raised in 3M's motion for sanctions are important, but the court believes it imprudent to rule on 3M's motion without further input from the parties, assuming that 3M wishes to continue pursuing sanctions.

---

[8] The accusations are all the more troubling, considering that Cleckner's counsel exhibited similar conduct in another religious discrimination case against 3M, which led to the dismissal of that plaintiff's complaint with prejudice as sanctions pursuant to Rule 37.  *Windish v. 3M Co.*, Civil No. 23-1531, 2024 WL 1604012, at *1 (E.D. Pa. Apr. 12, 2024).

CONCLUSION

For the foregoing reasons, the court will grant 3M's motion for sanctions and deny without prejudice 3M's motion for sanctions.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: September 2, 2025